Filed 10/27/14  P. v. Ferris CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE, | C069988 |
| Plaintiff and Respondent, | (Super. Ct. Nos. CR028077 & CR028926) |
| v. | |
| STEVEN GEORGE FERRIS, | |
| Defendant and Appellant. | |

Defendant Steven George Ferris appeals from a judgment of conviction following a jury trial.  Members of the Lassen County Narcotics Task Force executed a search warrant on his home and found baggies filled with methamphetamine, drug paraphernalia, and over $1,500 in cash.  Defendant was charged with possession of methamphetamine for sale (Health & Saf. Code, § 11378); felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)[1]); receiving stolen property (Pen. Code, § 496,

---

[1]  Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

subd. (a)); and transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)). Subsequently, a jury found defendant guilty on all counts except receiving stolen property.

On appeal, defendant contends that: (1) his trial counsel was ineffective because he failed to move to preclude the prosecution from impeaching defendant with his prior felony convictions, failed to move to bifurcate the trial, and failed to move to redact portions of defendant's recorded statement; (2) the prosecutor engaged in misconduct throughout the trial and defense counsel was ineffective in failing to object to the prosecutorial misconduct; and (3) these cumulative errors violated his right to due process.

We conclude that defendant has failed to show he received ineffective assistance of counsel or any other reversible error.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charges

On October 5, 2011, the Lassen County District Attorney filed a Second Amended Consolidated Information in case numbers CR028077 and CR028926, charging defendant as follows:

**Count one** -- possession of methamphetamine for sale in violation of Health and Safety Code section 11378;

**Count two** -- felon in possession of a firearm in violation of section 12021, subdivision (a)(1);

**Count three** -- receiving stolen property in violation of section 496, subdivision (a); and

2

**Count five** -- transportation of methamphetamine in violation of Health and Safety Code section 11379, subdivision (a).[2]

The information also alleged that defendant committed count five, transportation of methamphetamine, while released from custody on bail or on his own recognizance within the meaning of section 12022.1. Finally, the information alleged that defendant had served four prior prison terms (§ 667.5, subd. (b)). The prior convictions were as follows: a 1987 conviction for forgery (§ 470, subd. (a)); a 1994 conviction for escape (§ 4532, subd. (a)); a 1998 felony conviction in the State of Nevada for being under the influence of a controlled substance (Nev. Rev. Stat., § 453.411, subd. (1)); and a 2003 conviction for possessing a controlled substance (Health & Saf. Code, § 11377, subd. (a)).

**The Trial Evidence**

**The Prosecution's Evidence**

Defendant's three-day jury trial began on October 5, 2011. After the jury was selected, defendant agreed to stipulate that, for purposes of count two, felon in possession of a firearm, he was a felon at the time of his arrest.

On September 10, 2010, at 5:50 a.m., the Lassen County Narcotics Task Force (the Task Force), accompanied by a SWAT team, executed a search warrant at defendant's ranch home. Deputy David Woginrich, an agent with the Task Force in the Lassen County Sheriff's Office, testified that the team drove an armored vehicle through the closed gate to the ranch. The officers then knocked on the door of defendant's double-wide modular home on the ranch and announced themselves. Defendant responded to the door, and the officers pushed their way inside. In addition to defendant,

---

[2] The fourth count related solely to defendant's co-defendant, Erica Louise Schmid.

Carrie Stout, Kenneth Wilson, Melinda Smith and her child, and Erica Schmid, who was seven months pregnant with defendant's child, were also found in the home.

After sweeping the home and identifying the occupants, the officers began a search. In the master bedroom, in the nightstand, the officers found 0.17 grams of methamphetamine, a razor blade, a mirror, a $20 bill, small clean and empty Ziploc baggies with hearts on them, a digital gram scale with white residue on it, a small white "shard substance," and a tan pouch with approximately eight small Ziploc baggies with hearts on them, each containing between 0.95 and 1.8 grams of methamphetamine. Between the nightstand and the bed, the officers found a "green torch, canister, propane tank," which can be used to heat methamphetamine. Underneath the mattress, the officers found a spoon, a syringe, and another Ziploc baggie with hearts on it that contained a light crystal substance. In the other nightstand, the officers found women's items, a couple of heart-shaped baggies with pink pills inside one and yellow pills inside the other, and a white bottle containing some additional pills. Also in the master bedroom, the officers found a receipt and car insurance statement in defendant's name, a black cell phone, a methamphetamine pipe, and a purse inside a backpack containing six or seven pills and Schmid's driver's license. Finally, the officers also found in the bedroom a magazine to an Ithaca .22-caliber rifle and a white sock filled with .22-caliber shells.

The officers searched the rest of the home and found a small metal container containing a plastic bindle of a white substance and a spoon in the bedroom occupied by Stout and Wilson. There was also a camera located at the front door that projected live footage to a television monitor in the master bedroom. There was an aggressive pit bulldog guarding Smith's bedroom. In an outbuilding near the home, the officers found a .22-caliber Ithaca rifle and a Stihl model MS-440 chainsaw with a serial number matching that of a chainsaw reported stolen.

4

On a disposable cell phone Schmid had on her person when she was arrested, the officers found various incoming text messages related to drug sales.  Many of the messages were from "Atlantis," including the following:  "How much for half a zip?"; "I guess I am riding with Eldon, but because things didn't happen as planned earlier, I won't be able to come nowhere near the amount I had earlier"; "Almost to the [local store].  It's me, Atlantis, and Tony, I only need two. Come and I won't fail you and Steve now, I'm dedicated to chasing paper.[3]  Please let this happen, you won't be sorry"; "I'll put that Chevy down as collat and then give it to him for half if wanted afterwards."[4]  The phone also had a text message from another person, Bri:  "500 waiting in town.  It's me, it's me, Bri.  I got your pills.  I need 14 and will turn and burn with cash….  I really need this so I can make up what I'm short already."  There were also separate incoming text messages directed to both "Mom" and "Dad," indicating that both a man and a woman used the cell phone.[5]

During the search of the home, defendant was arrested and the officers searched his person, finding two syringes and approximately $1,549 in cash.  The officers took a urine sample from defendant when he was booked.  Testing of the sample revealed the presence of methamphetamine and amphetamine, which indicated that defendant had ingested methamphetamine within 72 hours of his booking.

---

[3]  Deputy Woginrich testified that in his experience, the phrase "chasing paper" typically refers to selling drugs to make money.

[4]  Deputy Woginrich testified that based on his experience, this message meant that Atlantis wanted to put his Chevy down as collateral in order to be fronted for drugs.

[5]  One text message read, "Hey, Mom, I love you with all my heart.  Tell my sister I love her, too, and to please, please be good.  I don't want her back in jail.  I love you, Mom.  Good night."  Others read, "Dad, please call or come by.  Thanks.  Love you" and "You alive, Dad?"

Deputy Woginrich testified that he had given defendant his *Miranda*[6] advisements, and defendant agreed to answer some questions. An audio recording of this interview was played for the jury.

During the interview, defendant admitted that he possessed the drugs in the tan pouch for sale and that he had last made a sale three days prior to his arrest. He admitted that he sold drugs "every now and then" for several years to supplement his disability income, and he explained that he weighed out the methamphetamine himself. Defendant listed the prices of his methamphetamine and stated that he usually only accepts cash in exchange for drugs. However, defendant said that the cash on his person was not from drug sales but from the sale of his Chevy truck to "a guy in Reno." Defendant would not disclose the name of the buyer. Defendant said the buyer was coming to pick up the vehicle the next day. Defendant denied that Schmid was helping him sell methamphetamine and denied that any of the drugs found during the search of the home belonged to her. He indicated that he was concerned about Schmid and the baby, and he wanted to protect her. He insisted that Schmid did not sell drugs for him but indicated that sometimes, she "did her own thing or whatever."[7] Defendant said he put the .22 rifle in the shed. He said the rifle was given to him and he had it for about a year. He had only fired it once and put it in the shed because he is a felon. He said, "I really wanted it so I put it out there and I was, you know, never use it or whatever."

Defendant stated that he bought the chainsaw from Dan Cook and denied any knowledge that it was stolen property.[8] Cook testified that he sold a different chainsaw

_____

[6] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

[7] Schmid also provided a urine sample when she was arrested and booked, and her sample also indicated that she had used methamphetamine within 72 hours.

[8] With respect to the stolen Stihl MS-440 chainsaw, the owner of the chainsaw also testified during trial. He testified that the chainsaw was stolen from his front yard in

to defendant. Defendant was released on bail after his arrest. On June 20, 2011, while defendant was still out on bail, Deputy Kyle Johnson stopped a car defendant was driving for a traffic stop. Deputy Johnson testified that defendant appeared to be under the influence of a stimulant, and when questioned, defendant admitted that he recently smoked methamphetamine. Deputy Johnson arrested defendant and searched his person, finding a syringe in his right pocket and two baggies containing methamphetamine in his left sock.

Based on the evidence recovered from defendant's home and defendant's statements during his interview, Deputy Woginrich opined that the methamphetamine found in the tan pouch in the nightstand in defendant's bedroom was possessed for sale. He testified that indicators of defendant's intent to sell the methamphetamine included the following: the drugs were packaged in small baggies; the weight of the methamphetamine in each baggie was about one gram, typical of quantities packaged for sale; the additional empty baggies with hearts on them that matched the drug-filled baggies; the digital scale; the $1,549 in cash on defendant's person; the messages on the disposable cell phone; information from confidential informants that defendant was selling methamphetamine; and defendant's admission to selling methamphetamine during his interview.

**Defense Evidence**

The defense asserted by trial counsel was that defendant was a methamphetamine user but not a dealer. Defendant testified at trial on his own behalf. When he took the stand, his attorney asked him, "And you are aware that one of the things jurors can take

---

September 2010. He identified the chainsaw recovered from defendant's home as his because it had his initials carved into the top and it had the same serial number as the one he reported stolen. While defendant claimed to purchase the MS-440 from Cook, Cook testified that he sold defendant a different Stihl chainsaw model, an MS-310. The jury found defendant not guilty of receiving the chainsaw as stolen property.

into consideration when they consider the truthfulness of what you might testify to would include such things as if you are a convicted felon. Do you understand that?" Defendant replied that he understood and admitted that he was a convicted felon. During his cross-examination, the prosecutor impeached his testimony with specific prior convictions. The prosecutor began his cross-examination by asking defendant, "We've known each other for a while, haven't we?" and questioned him about a 1993 theft conviction, which defendant claimed was an honest mistake. The prosecutor then went through defendant's four prison priors, and defendant admitted each one. We discuss this cross-examination in more detail, *post*.

Defendant testified that he was addicted to methamphetamine and had been using it for 35 years. He testified that he consumed about one gram of methamphetamine per day, he used the digital scale to measure it into precise one-gram portions, rather than "eyeball[ing]" it, and divided it among the baggies to prevent himself from overdosing. However, he also testified that he did not always ingest methamphetamine in one-gram portions; rather, he would start with about a half-gram in the morning and then more later in the day, sometimes using more than one gram in a day "because you get immune to it after a while." When he was asked whether the eight baggies containing methamphetamine were possessed for personal use, defendant said that they were for his "[p]ersonal use pretty much, mostly."

Contrary to his recorded statement, defendant testified that the .22 rifle was not his gun but owned by a youngster who was shooting squirrels and put it in the shed unbeknownst to defendant. He claimed that he found the bullets and magazine on his front steps and threw them in his bedroom.

Defendant testified that the $1,549 in cash found in his pocket was from the sale of his Chevy truck the previous night. Contrary to his recorded statement, he said he sold it to a woman. He said her name was Carrie Jackson, but then said her last name could be Kerry or Custer; he was not sure because he did not know if she was married. She had

8

been living in Herlong or Reno. He admitted that the truck was still on his property at the time of his arrest.

Defendant testified that Schmid did not live with him. Rather, she was a frequent overnight guest in his home.

Defendant claimed that he was under the influence of methamphetamine when he was interviewed following his arrest and was "pretty incoherent." He explained that he recalled some of what he said and that he told the officers "some long story" because he was being "belligerent." He claimed that he did not recall some portions of the interview but he knew that he did not answer all the officers' questions truthfully.

### Verdicts and Sentencing

On October 7, 2011, the jury found defendant guilty on all counts except count three, receiving stolen property.

On December 6, 2011, the trial court denied probation and sentenced defendant to 10 years 4 months in state prison. The sentence consisted of the following:

**Count five, transportation of methamphetamine:** three years (mid-term);

**Count one, possession of methamphetamine for sale:** eight months (one-third the mid-term) consecutive;

**Count two, felon in possession of a firearm:** eight months (one-third the mid-term) consecutive;

**Out-On-Bail Enhancement:** two years consecutive;

**Prior Prison Term Enhancement:** one consecutive year for each of the four prior prison allegations.

### DISCUSSION

### I. Ineffective Assistance of Counsel

### A. Additional Background and Defendant's Contentions

As we have noted, the prosecutor began his cross-examination of defendant by asking, "We've known each other for a while, haven't we?" The prosecutor then asked

9

defendant about the following convictions: (1) 1993 theft conviction; (2) 1987 forgery conviction; (3) 1994 escape, which defendant called a "walk away"; (4) 1998 felony conviction in Nevada for being under the influence of a controlled substance; and (5) 2003 felony conviction for possession of a controlled substance. Additionally, the prosecution asked defendant about the sentence he received for each conviction. The prosecution also introduced defendant's section 969b package during the cross-examination of defendant and asked him a series of questions about it, including questions designed to show the absence of a five-year wash-out because of a parole violation and an intervening conviction. Additionally, defendant's recorded statement included questions and answers about his prior prison commitments.

Defendant's recorded statement also included discussion about his pregnant girlfriend using drugs and the effect that might have on the baby. The recording also included the following statement made by the interrogating officer to defendant: "You've been sellin' drugs for a long time, bro. Long time. Like I said, we just didn't scrounge together a search warrant and decide to go up there today."

On cross-examination of Woginrich, defense counsel asked whether the indicia of sales upon which he relied in forming his opinion included, "all inclusive, the scale, the baggies, the razor, the mirror and pretty much everything else that was admitted into evidence[?]" Woginrich replied without objection, "Yes, also along with citizen informant information that we had received prior to." Later, in answering defense counsel's question about whether he would change his opinion regarding whether the methamphetamine was possessed for sale in the absence of the cash and scale, Woginrich replied again without objection, "based on what I know, how I know [defendant] and based on his past and my past experiences with him, my opinion probably wouldn't change."

Defendant asserts he was provided ineffective assistance of counsel. Specifically, he claims that his counsel: (1) failed to move to preclude the prosecution from

10

impeaching him with his prior felony convictions pursuant to *People v. Castro* (1985) 38 Cal.3d 301 and Evidence Code section 352 (a *Castro* motion); (2) failed to move to bifurcate the prison prior allegations; (3) failed to seek redaction of prejudicial matters in the interrogation transcript and audio recording; and (4) failed to move in limine to exclude any mention of confidential informants and Deputy Woginrich's prior contacts with defendant. He argues that because his counsel did not seek to limit or exclude evidence regarding his prior convictions, the jury may have used this evidence to convict him for prior bad acts. He argues that these convictions were not admissible to impeach him because the drug convictions were not crimes of moral turpitude and the forgery and escape convictions were too remote. He further complains that in addition to hearing about his prior convictions, the jury learned of the details of his prison commitments through the prosecutor's cross-examination and the information contained in the section 969b package. Defendant contends that his counsel would have been successful in moving to limit or exclude the evidence of the prior convictions pursuant to *Castro* and moving to bifurcate the trial on the prior prison term enhancements. Additionally, he argues that his attorney should have moved to redact and exclude the above referenced matters in his interview transcript and recording. He also complains that defense counsel's cross-examination elicited damaging evidence. He contends that because these matters are irrelevant and prejudicial, they would have been successfully excluded under Evidence Code section 352 had trial counsel made the appropriate in limine motion.

Based on these failures, defendant says he received constitutionally ineffective assistance of counsel. We disagree.

### B. Analysis

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v.*

11

*Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task. [Citation.]' " (*Harrington v. Richter* (2011) 562 U.S. 86, __ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

### 1. Deficient Performance

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] … It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Richter*, *supra*, 562 U.S. at p. __ [178 L.Ed.2d at pp. 642-643].)

In this case, there is evidence that defendant's trial counsel made reasonable tactical decisions in not seeking to exclude the prior convictions. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) The defense's theory of the case was that defendant possessed the methamphetamine and drug paraphernalia for personal use, and defense counsel elicited testimony from defendant to establish that he had been using methamphetamine for 35 years. In short, defense counsel's goal was not to show that defendant was completely innocent of any crime but simply that he did not intend to sell the drugs. During defense counsel's closing argument, he argued that the physical evidence "absolutely show[ed] personal use" but did not "have anything to do with sales." Because two of defendant's prior convictions were for drug possession and defendant had no prior drug trafficking convictions, defense counsel may have reasonably decided that the drug possession convictions were helpful to establish that defendant was a drug user rather than a dealer. Further, because of the charge in count

12

two that defendant was a felon in possession of a firearm (§ 12021, subd. (a)(1)), defendant agreed to stipulate that he was a felon at the time of his arrest. For this reason, the jury would have heard that defendant was a convicted felon even if evidence of the specific nature of the prior felonies was excluded. Defense counsel may have reasonably concluded that it was preferable that the jury hear the nature of defendant's prior convictions rather than allow them to speculate that he had been previously convicted of trafficking narcotics or that the convictions involved even more serious felonies.

### 2. Prejudice

Defendant concedes that the evidence that he possessed methamphetamine, transported methamphetamine and consumed methamphetamine was "irresistible," but evidence that he possessed it for sale was not and that he would not have been convicted on that count (which resulted in additional eight-month prison term) had trial counsel's performance not been deficient. We disagree.

Assuming the defense counsel's decisions to forgo bifurcation and allow the jury to see defendant's section 969b package as part of a unitary trial, to not object to the admission of the portions of defendant's unredacted transcript and audio recording we have referenced, and/or to not move to preclude reference to the officers' prior experiences with defendant or information from confidential informants was incompetent under prevailing professional norms, we conclude that defendant was not prejudiced.

To establish prejudice, "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" (*Richter*, *supra*, 562 U.S. at p. __ [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

Here, the evidence against the defendant was overwhelming. The defense argued that defendant was merely a drug user, did not possess the drugs for sale, and had no knowledge of the gun in his shed or receiving a stolen chainsaw. Defendant's testimony on these points was inconsistent with his confession, and his explanation that he confessed because he was under the influence of methamphetamine and was being "belligerent" was unpersuasive. Defendant admitted that he possessed the drugs in the tan pouch for sale, he had last made a sale three days prior to his arrest, and he sold drugs "every now and then." He explained that he weighed out the methamphetamine himself and listed his prices to the officers. While drug testing indicated that he did ingest methamphetamine within 72 hours of his booking, the transcript of the interview evidences that defendant was coherent and responsive to the questions.

Defendant's trial testimony was not only inconsistent with his confession but also with the physical evidence found in his home and on his person. While defendant possessed only nine one-gram baggies of methamphetamine, it is clear he did not purchase those particular baggies from another dealer because he had the same distinctive baggies with hearts on them in his nightstand, which were clean and empty. Defendant explained at trial that he measured out his daily portions of the methamphetamine so that he would avoid overdosing and that it was important to him to use a digital scale to be precise rather than "eyeballing" it. However, this explanation is inconsistent with his testimony that he usually used a half-gram portion in the morning and another half-gram later in the day. If defendant was taking the time and care to measure out his doses with a digital scale, repackage them in separate baggies, and his habit was to take a half-gram at a time, then a jury was likely to conclude it would have made more sense to measure out half-gram doses into the baggies. Additionally, defendant testified that he sometimes took more than a gram at a time. In fact, he stated that he sometimes used more than a gram in a day "because you get immune to it after a while." Accordingly, he sometimes

14

"eyeballed" his dose and was not very concerned with overdosing on more than a gram because he had used methamphetamine for 35 years and become "immune to it."

In addition to the inconsistencies in defendant's testimony about his methamphetamine usage, defendant's explanation for the large sum of cash in his pocket was suspect. He claimed that he sold his truck for $1,549 in cash, yet he still had the truck parked on his property. He told the officers he sold it to "a guy in Reno," but testified that he sold it to a woman. Additionally, there were numerous incoming text messages on the cell phone found in Schmid's possession related to drug sales and separate messages directed to both "Mom" and "Dad," indicating that both a man and a woman used the phone rather than Schmid alone.

Defendant's testimony that the .22 rifle was owned by a youngster who left it in the shed was also suspect. He claimed that he found the bullets and magazine on his front steps and threw them in his bedroom. However, during the search of the bedroom, the officers found a magazine for the rifle and a white sock filled with .22-caliber shells. Moreover, when he talked to the police about the rifle, he said the gun was his, he "really wanted it" and he kept it in the shed because he is a felon.

Finally, the fact that the jury did not convict him on count three, the receiving stolen property count related to the chainsaw, indicates that the jury was not prejudiced against defendant as the result of learning about defendant's prior convictions, the details of his prison commitments or the other information defendant now complains about on appeal.

Accordingly, we cannot conclude that but for defense counsel's alleged deficient performance, there was a reasonable probability of a more favorable result. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) Defendant has not demonstrated that he was prejudiced. Consequently, we reject his ineffective assistance claim.

## II.  Prosecutorial Misconduct

## A.  Additional Background and Defendant's Contentions

Defendant contends the prosecutor committed several instances of prejudicial misconduct during the trial.  He argues that the "prosecutor's pattern of misconduct was egregious and [defendant's] trial counsel was incompetent for failing to object and request an admonition."

The first allegation pertains to the following passage of multiple questions by the prosecutor in response to defendant's refusal to reveal the name of the person who sold him the methamphetamine:  "How dedicated to the truth in this case are you, sir?  Apparently not really.  Who sold you that meth?  Are you weighing there?  Don't look at him, he ain't going to help you, look at me.  You trying to decide in your mind whether or not you're going to answer that one?  You're going to bite the bullet, huh?  [¶]…[¶] All right.  Man, we've been doing this for 20 years, haven't we, Ferris?"

The second statement occurred in chambers with the trial judge, defense counsel, and Juror Number 9.  Juror Number 9 was concerned that she may have been on the jury in one of defendant's previous criminal cases.  The following took place in chambers.

"[DEFENSE COUNSEL]:  Your Honor, if I may, I just inquired of Mr. Ferris about that and he said that was a court trial, not a jury trial.

"THE COURT:   Understand, thank you.

"JUROR NUMBER 9:  Awesome, thank you.  I just said and I was 20 and I'm like I don't know.

"THE COURT:  Mr. [Prosecutor], do you have something to say on the subject?

"[THE PROSECUTOR]:  Yes,  I was the one that went to trial on that issue and I seemed to recall it being a court trial, although I was not certain and it was in --

"[DEFENSE COUNSEL]:  Judge Bradbury.

"[THE PROSECUTOR]:  -- this very courtroom and *I remember a particular colloquy of the witness, the complaining witness where she says I've been trading with*

16

*this individual, and being the city boy I was, I didn't understand what she meant that*

*she* --

"THE COURT: That would have been Judge Bradbury was trying it.

"[THE PROSECUTOR]: Yes." (Italics added.)

The third instance occurred during closing arguments, when the prosecutor explained to the jury that he was not allowed to tell the jury about defendant's prior convictions and the section 667.5, subdivision (b), allegations in his opening statement because defendant had not yet testified, and he remarked, "I always kind of thought that wasn't fair, but that's just me. I get put in a position, almost with you folks and not telling you everything in the opening and then having to switch up, but that's what I'm compelled to do by law."

Lastly, defendant alleges that the prosecutor asked Deputy Woginrich "a series of irrelevant, leading questions about the dog" found in the house "with the clear purpose of depicting [defendant] and co-defendant Erica Schmid as drug dealers by virtue of their possession of a pit bulldog that had belonged previously to a convicted drug dealer…." The following colloquy occurred:

"[THE PROSECUTOR]: Do you know, tell us about this dog again.

"[DEPUTY WOGINRICH]: I have seen this dog before approximately four years earlier, about maybe three and a half years earlier.

"[THE PROSECUTOR]: Belonged to somebody else then, didn't it?

"[DEPUTY WOGINRICH]: Yes, it did.

"[THE PROSECUTOR]: Who?

"[DEPUTY WOGINRICH]: Mike Saroian.

"[THE PROSECUTOR]: Where is he?

"[DEPUTY WOGINRICH]: I believe he was just released from prison a couple months ago.

"[THE PROSECUTOR]: On possession for sale of meth, right?

17

"[DEPUTY WOGINRICH]: Yes.

"[THE PROSECUTOR]: And he gave his dog to somebody?

"[DEPUTY WOGINRICH]: Yes.

"[THE PROSECUTOR]: Who?

"[DEPUTY WOGINRICH]: Erica Schmid."

## B. Forfeiture

" ' "A prosecutor's…intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] ' "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 260 (*Prieto*).)

There was no objection at trial to the conduct defendant now complains about on appeal. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; see also *Prieto*, *supra*, 30 Cal.4th at p. 260.) Defendant has therefore forfeited his claim of error. We grant relief from forfeiture only where objections or admonitions would have been futile or the misconduct's nature was incurable, which a defendant must establish affirmatively rather than through a "ritual incantation." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Here, defendant does not argue that we should grant him relief from forfeiture but instead styles his prosecutorial misconduct argument as further evidence of his attorney's ineffective assistance. Accordingly, we decline to grant relief from forfeiture.

### C. Ineffective Assistance of Counsel

To succeed on his ineffective assistance claim based on prosecutorial misconduct, defendant must not only show that the prosecutor's remarks were egregious but also that his counsel's failure to object constituted deficient performance and prejudiced him under the *Strickland* test.

We agree with defendant that many of the prosecutor's statements were inappropriate. The series of questions the prosecutor asked defendant about the person from whom he purchased the methamphetamine was argumentative at best, and inappropriate. When the court asked the prosecutor if he had anything to say about the prior trial on which one of the jurors thought she might have sat, the prosecutor should have limited his remark to his recollection that the trial was a bench trial. There was no need to comment about the testimony of one of the witnesses. Also, the prosecutor should not have complained in his closing argument that it was "unfair" that he could not raise defendant's prior convictions earlier in the trial. This was unprofessional. And we can see no relevance to questions concerning the dog and its former owner. It appears to us that the prosecutor's intent was to paint defendant in an unfavorable light by drawing the jurors' attention to whatever information was available to him, no matter how inappropriate and contrary to the rules of evidence and fair play.

Nevertheless, we conclude that defendant has not shown that defense counsel's failure to object and request an admonition was prejudicial. As we have discussed, the evidence against defendant was overwhelming and his confession was more consistent with that evidence than his trial testimony. The jury was instructed to decide the case based only on the evidence and further instructed that nothing the attorneys said was to be considered as evidence. We presume the jury followed the instructions. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn 9.) We cannot conclude that but for defense counsel's failure to object to the prosecutor's inappropriate comments, there would have been a reasonable probability of a more favorable result "sufficient to undermine

confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)

### III. Cumulative Error

Defendant contends that the cumulative effect of the alleged ineffective assistance and prosecutorial misconduct warrants reversal. We reject this contention. The premise behind the cumulative error doctrine is that while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) Any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We have found no prejudice when considering defendant's claims of ineffective assistance of counsel separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

### DISPOSITION

The judgment is affirmed.


     MURRAY     , J.


We concur:


     BUTZ     , Acting P. J.


     DUARTE     , J.